FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DISTRICT

2015 SEP 30  AM 10: 59

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE FLORIDA

)
**DUVAL ROYAL INVESTMENTS, INC.,**  )
a Florida corporation, and  )
**BROTHERS FIVE OF JACKSONVILLE**,  )
a Florida general partnership,  )
 )  CASE NO.: 3:15-cv-1163-J-32JRK
Plaintiffs,  )
 )
vs.  )
 )
**CITY OF JACKSONVILLE BEACH**,  )
**FLORIDA,** a Florida municipal corporation  )
 )
Defendant.  )
_____/

# VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT,
## INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs, DUVAL ROYAL INVESTMENTS, INC. and BROTHERS FIVE OF

JACKSONVILLE, file this Complaint against the CITY OF JACKSONVILLE BEACH,

FLORIDA, pursuant to 42 U.S.C. §1983, seeking a judgment declaring certain

ordinances, policies and practices of the Defendant to be unconstitutional under the First

and Fourteenth Amendments to the United States Constitution. Plaintiffs further pray for

an award of damages for the losses occasioned by the unconstitutional application of the

City's law against the Plaintiffs.

## JURISDICTION

1.      This suit is brought pursuant to 42 U.S.C. §1983:

Every person who, under color of any statute, ordinance, regulation,
custom, or usage, of any State or Territory or the District of Columbia,

subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

2.      This Court has "Federal Question" jurisdiction pursuant to 28 U.S.C. §1331 to hear cases arising under the Constitution of the United States, under 28 U.S.C. §1343(3) to redress the deprivation under color of state law of any right, privilege or immunity secured by the Constitution, and under 28 U.S.C. §1343(4) to secure equitable or other relief for the protection of civil rights.

3.      The Court has the authority to issue declaratory judgments and permanent injunctions pursuant to 28 U.S.C. §§2201 and 2202, and Rule 65, Fed.R.Civ.P.

4.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1366.

5.      The Court may enter an award of attorney's fees pursuant to 42 U.S.C. §1988.

6.      This Complaint seeks declaratory and injunctive relief to prevent violations of the Plaintiffs' rights, privileges and immunities under the Constitution of the United States and Title 42 U.S.C. §§ 1983 and 1988, specifically seeking redress for the deprivation under color of state statute, ordinance, regulation, custom or usage of rights, privileges, and immunities secured by the Constitution and laws of the United States. The rights sought to be protected in this cause of action arise and are secured under the First and Fourteenth Amendments to the Constitution.

7.      This action seeks a judicial determination of issues, rights and liabilities embodied in an actual and present controversy between the parties involving the constitutionality of certain Ordinances and policies of the Defendant. There are substantial *bona fide* doubts, disputes, and questions that must be resolved concerning the Defendant's actions taken under color and authority of "state" law and procedures, in violation of Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution.

## VENUE

8.      Venue is proper in the Middle District of Florida, Jacksonville Division, since the laws and policies complained of are those of Jacksonville Beach, Florida, which is within the district and geographical area assigned to the Jacksonville Division.

## PARTIES

9.      Plaintiff DUVAL ROYAL INVESTMENTS, INC. is the owner of certain real property known as "North Beach Village" located at 1515 Third Street North, Jacksonville Beach, Duval County, Florida.

10.     Plaintiff BROTHERS FIVE OF JACKSONVILLE, is a Florida general partnership, which owns certain real property located at 1227 South Third Street Jacksonville Beach, Duval County, Florida.

11.     Defendant, City of JACKSONVILLE BEACH, is a Florida municipal corporation, organized and operating under the laws of the State of Florida.

## COLOR OF STATE LAW

12.     As a political subdivision of the State of Florida, organized and operating

under the laws of the State of Florida, the City of JACKSONVILLE BEACH and its governing officials were, and are, acting under color of state law and authority in adopting and enforcing the subject ordinances, as amended. The enforcement and threatened enforcement of the subject ordinances against Plaintiffs is an action taken under color of state law and constitutes state action within the meaning of 42 U.S.C. §1983.

13.     The ordinances, actions and policies of Defendant JACKSONVILLE BEACH have deprived and will continue to deprive Plaintiffs and their tenants and patrons of rights guaranteed and protected by the First and Fourteenth Amendments to the United States Constitution.

## PLAINTIFFS' BUSINESS AND SPEECH ACTIVITIES

14.     The Plaintiffs' respective properties are zoned for commercial use and both properties are used for commercial purposes.

15.     Plaintiffs operate strip commercial centers at their respective properties.

16.     Plaintiffs lease individual units to a wide variety of tenants, most of which operate commercial establishments, but others operate as non-profits or otherwise lease space for non-commercial purposes.

17.     Plaintiffs own and maintain fixed pole signs on their properties (*i.e.* "on-premises signs") which are lawful non-conforming signs under the Jacksonville Beach Sign Code.

18.     Those signs include advertisements and other information for Plaintiffs' tenants as well as advertisements and messages for Plaintiffs' own use and benefit.

19.     In addition to the fixed commercial signs, Plaintiffs and their tenants post signs which are considered "political campaign sign or election signs" under the Jacksonville Beach Sign Code. Those signs advocate for particular candidates for elective office or for various political issues or causes.

20.     Plaintiffs and their tenants also post signs which are considered "free expression signs" under the Jacksonville Beach Sign Code. Those signs include signs offering support of civic groups such as the United Way, Boy Scouts and Boys and Girls Clubs as well as an endless variety of opinions, causes and other non-commercial messages.

21.     Plaintiffs' signs, and those of its tenants, are fully compliant with the Jacksonville Sign Code and Plaintiffs have obtained all permits necessary to display those signs.

22.     While all of Plaintiffs' signs are currently on-premises signs, they would like to also advertise and post non-commercial messages on signs located off of their property. However, the Jacksonville Beach Sign Code prohibits [§34-452(5)] the erection of new "billboards" which is the generic term used by the Code for off-premises signs. *See*, §34-41.

## THE SIGN ORDINANCE

23.     The Jacksonville Beach Sign Ordinance is codified as Chapter 34 (Land Development Code), Article VIII, Division IV, §§34-441 through 34-457, et, seq. of the Jacksonville Beach Code of Ordinances. The definitions employed by the sign code are

found in Chapter 34, Article IV, §34-41 of the Jacksonville Beach Code of Ordinances.[1] Those code sections shall be referred to in this Complaint as "the Jacksonville Sign Code". A copy of the Jacksonville Beach Sign Ordinance currently in effect is attached as Exhibit "A" to this Complaint.

24. Plaintiffs' right to engage in political and commercial speech is infringed upon by the Jacksonville Beach Sign Ordinance.

### CONTENT-BASED NATURE OF THE SIGN ORDINANCE

25. The Jacksonville Beach Sign Ordinance discriminates on the basis of content without serving a compelling government interest through the least restrictive means.

26. Even applying intermediate scrutiny, the numerous distinctions between different speakers and different messages are not supported by a substantive government interest nor is that interest advanced by a narrowly tailored law.

27. The Jacksonville Beach Sign Ordinance is unconstitutionally underinclusive for the same reasons relied on by the Supreme Court in City Of Ladue, v. Gilleo, 512 U.S. 43, 114 S.Ct. 2038 (1994); the Ordinance discriminates on the basis of identity of the speaker and the particular message displayed on a sign.

28. Plaintiffs, and their tenants and patrons, have suffered and will continue to suffer the loss of their First Amendment rights because the Jacksonville Beach Sign

---

[1] As codified, the various definitions are not designated by individual subparagraphs. Instead, the definitions appear alphabetically in the single section §34-41.

Ordinances include content-based regulations which unfairly discriminate against signs Plaintiffs have displayed and would like to display in the future.

29.     At its most basic and fundamental level, a sign is the use of a tangible medium to convey a message.[2]

30.     However, the Jacksonville Beach Sign Ordinance does not take such as simple approach to defining a "sign" and does not regulate signs equally. Instead, the Sign Ordinance adopts an enormously complex regulatory scheme which discriminates against certain messages and favors certain other messages. In constitutional parlance, the Sign Ordinance is content-based.

31.     The content-based nature of the Ordinance can be seen in the way the law categorizes signs and messages based on the particular message displayed (content) or by the particular speaker. There are at least four separate ways in which those categories are created and applied:

A.     A number of tangible messages are not included within the definition of "sign" or are expressly exempted from the reach of the Ordinance. These messages are **excluded** from the regulations applicable to all other messages and all other signs.

---

[2]   A typical dictionary definition reads as follows: "A notice that is publicly displayed giving information or instructions in a written or symbolic form" Oxford Dictionary, "Sign" accessible on-line at http://www.oxforddictionaries.com/us/ definition/american_english/sign; *See, also*, Merriam-Webster Dictionary, "Sign" accessible on-line at http://www.merriam-webster.com/dictionary/sign ("a piece of paper, wood, etc., with words or pictures on it that gives information about something").

B. A number of signs are **exempted** from the requirement that they obtain a permit which is a prerequisite for displaying other signs. These exemptions are based on what the sign says or who the speaker is who wishes to display the sign.

C. Certain signs are **discriminated** against based on their content with the favored signs being larger, more numerous or displayed for a longer period of time. The unequal signs fall into several sub-categories:

(1) Certain non-commercial messages ("free expression signs") are treated more favorably than other forms of non-commercial messages (i.e. "election signs").

(2) Certain favored events (those which are "civic, charitable, or non-profit") can display temporary vertical banners that are disallowed for all other speakers.

(3) Commercial signs are treated differently from non-commercial signs for reasons having nothing to do with commerce or the government's interest in regulating same.

(4) Certain commercial messages and speakers are treated more favorably than other commercial messages (including such specific businesses as gas stations, valets, Christmas tree salesmen and firewood vendors).

D. Certain signs are **prohibited** in all circumstances, with some of those prohibitions depending upon the content of the particular sign.

32. The definition of "sign" found in the Jacksonville Beach Sign Ordinance (§34-41) - is as follows:

Sign means any device, fixture, placard or structure, including its component parts, which draws attention to an object, product, place, activity, opinion, person, institution, organization, or place of business, or which identifies or promotes the interests of any person and which is to be viewed from any public street, road, highway, right-of-way or parking area. For the purposes of these regulations, the term "sign" shall include all structural members. A sign shall be construed to be a display surface or device containing organized and related elements composed to form a single unit. In cases where matter is displayed in a random or unconnected manner without organized relationship of the components, each such component shall be considered to be a single sign. In the case of a permanent sign made of any fabric or other non-rigid material, the sign shall conform to each specification for such signs found elsewhere in the Code. However, the following are not within the definition of a "sign" for regulatory purposes of this chapter:

(1)     Architectural features: Decorative or architectural features of buildings (not including lettering, trademarks or moving parts);

(2)     Symbols embedded in architecture: Symbols of noncommercial organizations or concepts including, but not limited to, religious or political symbols, when such are permanently integrated into the structure of a permanent building which is otherwise legal;

(3)     Personal appearance: Items or devices of personal apparel, decoration or appearance, including tattoos, makeup, costumes (but not including commercial mascots);

(4)     Manufacturers' marks: Marks on tangible products, which identify the maker, seller, provider or product, and which customarily remain attached to the product even after sale;

(5)     Fireworks, etc.: The legal use of fireworks, candles and artificial lighting not otherwise regulated by this chapter;

(6)     Certain insignia on vehicles and vessels: On-street legal vehicles and properly licensed watercraft: license plates, license plate frames, registration insignia, noncommercial messages;

(7)     Grave stones or grave markers;

(8)     News racks and newsstands.

(9)     Artwork.

### Content-Based Exclusions

33.     Certain messages displayed on a physical medium are excluded altogether from regulation under the Jacksonville Beach Sign Code even if they convey a message equivalent to that found on other kinds of media which are regulated by the Code. In essence, the exempted messages are treated as non-sign signs.

34.     Those exclusions occur in one of two ways:

A.     By express exclusion under §34-446 of the Sign Code; or

B.     By implied exclusion accomplished through definitional magic; the Code includes a list of items which lie outside the statutory definition of sign found in §34-41.

35.     Both classes of exception include distinctions which are based on the content of the message and/or the identity of the speaker rather than the size, placement or number of such messages.

36.     At least two of the express exceptions found in §34-446 fall are impermissibly based on the content of speech:

A.     Section 34-446(5) of the Sign Code excludes "[t]emporary holiday and seasonal decorations" from regulation under the Code. That term is defined in §34-41 of the Code as follows:

> Holiday and seasonal decorations means decorations that pertain to legal or other recognized holidays or to a season of the year.

A codes official must examine a particular decoration to determine whether it is associated with a "recognized holiday" or "season of the year". Presumably, only a certain

subset of potential holidays are "recognized" with that list being created by the City in its unfettered discretion.

B.    Section 34-446(6) of the Sign Code excludes "[a]rtwork that does not meet the definition of a sign." Artwork is in turn defined in §34-41 of the Code as follows:

> Artwork means a two- or three-dimensional representation of a creative idea that is expressed in a form and manner as to provide aesthetic enjoyment for the viewer rather than to specifically convey the name of the business or a commercial message about the products or services offered on the property upon which the artwork is displayed. …

No concept could be more content-based, as beauty is surely in the eye of the beholder – in this case the eye of the code official called upon to determine whether the message is aesthetically pleasing and whether that aesthetic component outweighs whatever commercial content or advertising may be associated with the message.

37.    The implied exceptions in §34-41, arising out of the definition of "sign", include the following content-based determinations (discussed in the order in which they appear in the definition):

A.    The exemption for "symbols embedded in architecture" presumably includes such designs as the Cross, the Star of David and Masonic symbols. In order to determine whether a symbol falls within the exemption, the permitting official must read or view the message to determine whether it is associated with "noncommercial organizations or concepts". The Code does not require that the embedded message itself be non-commercial in nature; only that it be affiliated with a noncommercial organization or concept. Thus, the Catholic Church or the Communist Party could advertise its "Buy Here, Pay Here" car lot using its traditional symbols, with no size limitation (other than

the size of their building), while "Joe's Used Cars" down the street is limited to the usual commercial signage.

B.      The Ordinance exempts, in a round-about fashion, non-commercial "mascots", which are within the definition of "(3) personal appearance". *See, also*, Section 34-452(8) (prohibited signs). Under the Code, the mascot for a High School football team can show his team spirit along Jacksonville's roadways, but a fan of Jacksonville's pro football team wearing exactly the same outfit would be subject to citation. The only way to determine whether the costume is subject to the Ordinance or exempt (and consequently lawful or unlawful) is for the code officer to ask whom the person is rooting for.

C.      Generally speaking, all commercial messages are regulated as signs and are subject to greater restrictions than non-commercial messages. The exception is "(4) Manufacturers' marks," which are completely exempt and unregulated by the Sign Code. In order to determine whether the exemption applies, the code official must not only read the attached flag, banner, tag or other device, but must also determine that the copy is associated with the product which has been sold.

D.      The Ordinance favors "(8) news racks and newsstands," because messages that appear on those physical structures are completely exempt from the sign code. While the Ordinance does not define either of those terms, presumably, the codes official must evaluate the nature of the product being sold and determine whether it constitutes "news" before any enforcement decision can be made. Given the vagueness of the language, it is

also possible that the official must determine *who* the vendor is before the official can determine whether the message is unregulated as a non-sign.

E.      The Ordinance excludes "(9) Artwork" from the §34-41 definition of signs and separately excludes artwork under §34-446(6).  Aesthetically pleasing art can convey the same message in the same area in the same manner as its less aesthetically pleasing cousin, the common sign. There is no basis other than content to distinguish "artwork" from any other type of sign. Furthermore, the designation of the codes officials as local art critics invites arbitrary decision-making based on content.

### Content-Based Exemptions

38.      A sign permit is required for all commercial signs and certain non-commercial signs:

> Sec. 34-450. - Sign permits.
>
> Unless exempt from permitting, no permanent sign shall be erected, altered, relocated, maintained or displayed until a sign permit is obtained from and the appropriate fee paid to the city.

39.      The permitting requirements impose substantial burdens on a speaker, including disclosure requirements, a monetary assessment and delay before the speaker's message can be displayed.

40.      However, the Sign Ordinance exempts a large number of messages and speakers from obtaining a sign permit altogether. *See*, §34-453(2) ("Sign permits are not required for signs and sign types described and identified below in this subsection."). Those exempt speakers and messages enjoy an advantage over those speakers and messages which are subject to the burdensome permitting requirements. Relief from the

permitting requirement is largely dependent upon the content of the message or the identity of the speaker. Plaintiffs allege the following particulars:

A.      Section 34-453(2)(a) excludes "Bus stop information signs." Bus operators are singled out for favorable treatment not afforded private cab services or any other commercial enterprise. The Ordinance limits the content of bus stop information signs to "information as to the route, hours or times of service". Thus, permitting officials must inquire about the contents of the sign as well as the identity of the speaker to determine whether a permit is required.

B.      Section 34-453(2)(b) exempts "constructions signs" from the permitting requirement. The definition of "construction sign" in §34-41 is not limited to sites where construction is ongoing, but extends to the particular content of the sign on a construction site:

> Construction sign means a temporary on-premise sign identifying the ongoing construction activity during the time that a building permit is active and prior to completion of the work for which the permit was issued, and containing sign copy that is limited to the ongoing construction activity and identifying the contractor and/or any subcontractor engaged to perform construction activity on the site.

C.      Section 34-453(2)(c) exempts "flags" from the permitting requirement. "Flags" are not defined in terms of shape or material, but specifically includes within its definition a content-based term – namely that the flag is used "as a symbol, standard, signal, or emblem." *See*, §34-41 for definition.

D.      Section 34-453(2)(d) exempts "free expression signs" defined as "a sign communicating information or views of concern to the owner of the sign, or containing any other non-commercial message, that is otherwise lawful." *See*, §34-41. The

"substitution clause" of the Ordinance allows a sign owner to display a free expression sign without obtaining a permit [*See*, §34-454] while the same owner would need to obtain a permit to erect any other message on the same sign. Content is therefore the only basis for the distinction.

E.      Section 34-453(2)(f) exempts certain commercial signage for Home occupation signs" while requiring permits for essentially all other commercial purposes and messages.

F.      Section 34-453(2)(h) exempts certain non-commercial parking space signs", but requires a permit for exactly the same sort of sign if it bears a commercial message.

G.      Section 34-453(2)(i) exempts "[p]olitical campaign or election signs" which are defined in §34-1 as follows:

> Political campaign sign or election sign means any sign indicating the name and/or picture of an individual seeking election to a public office, or relating to a forthcoming public election or referendum, or pertaining to the advocating by persons, groups or parties of political views or policies.

Any permitting decision relative to "political campaign or election signs" must made by examining the content of the sign, not the sign itself.

H.      Section 34-453(2)(j) exempts temporary "[r]eal estate signs" defined by §34-41 as "a sign indicating that real property is available for sale, exchange, rent or lease." Similar exemptions are not afforded for sales of any other good, product or service. A permitting official must carefully examine the content as the sign as the ordinance requires that certain information ("the names and contact information for

persons involved in such economic transaction") be included in order to enjoy the exemption.

I.      Section 34-453(2)(l) exempts valet parking signs from the permitting requirement – a unique exemption not extended to other commercial businesses with equivalent parking concerns.

## Content-Based Discrimination; Disparate Treatment

41.     Both "political campaign or election signs" and "free expression signs" are, by definition, non-commercial messages:

> Non-commercial message means any message which is not a commercial message.

*See*, §34-41.

42.     The standards which apply to commercial speech and commercial signs find no application to "political campaign or election signs" and "free expression signs" which do not propose a commercial transaction.

43.     There is no basis to distinguish "political campaign sign or election signs" from "free expression signs" other than the content of the particular message being displayed.

44.     The Ordinance treats "political campaign sign or election signs" less favorably than signs bearing other non-commercial messages. Plaintiffs allege the following particulars:

A.      Section 34-453(2)(i)3 specifies that "political campaign sign or election signs" on commercial property (like Plaintiffs') can be no more than six feet high:

3.      On non-residential parcels, a political campaign or election sign shall not exceed sixteen (16) square feet in sign area; and, if the election sign is displayed as a freestanding sign on the parcel, the election sign shall not exceed six (6) feet in height.

B.      In contrast, §34-453(2)(d)1 allows "free expression signs" to be as high as eight feet:

1.      Free-standing free expression signs shall not exceed four (4) square feet in sign area, and six (6) feet in height for single family residential zoning districts, or sixteen (16) square feet in sign area, and eight (8) feet in height for multiple family and nonresidential zoning districts.

C.      Section 34-453(2)(i)4 requires that "[a]n election sign shall be removed within seven (7) calendar days following the election to which it pertains." There is no such time limitation on free expression signs. *See*, §34-453(2)(d), *generally*.

D.      The Sign Code allows for only a limited number of election signs: "one (1) election sign for each candidate and each issue may be displayed on each frontage per parcel of land." *See*, 34-453(2)(i).

E.      In contrast, §34-453(2)(d)4 allows for the addition of a "free expression sign" even after a speaker has reached the maximum amount of signage for any other kind of display:

4.      A free expression sign is in addition to any other sign permitted under this Code and is permitted in any zoning district.

45.     Section 34-458(3) allows citizens to erect "Vertical streetlight banners" for "civic, charitable, or non-profit special events" on public property.[3] The determination of which signs qualify requires an evaluation of both the speaker and what the speaker says:

A.     By the terms of the Ordinance, not all events to which the public is invited would necessarily qualify as "civic, charitable, or non-profit special events". For example, banners advising the public of the next Jacksonville Jaguars game may or may not qualify as a "civic" event even though the game is newsworthy and the general public is invited.

B.     The Ordinance requires an examination of the banner as well as the speaker and the particular event:

e.     A vertical streetlight banner may include the sponsor's name and logo used to help identify the event and not for advertising purposes...

Apparently a commercial business can be identified on a vertical banner and the logo it uses in commerce can be displayed so long as a code officer determines that it is "not for advertising purposes". That is a determination that cannot be made other than by reading the sign and considering its context and subjective purpose.

46.     The Ordinance favors certain commercial viewpoints and certain speakers over others. Plaintiffs allege the following particulars:

A.     Gasoline service stations are allowed to display additional commercial signs above and beyond those allotted to all other commercial uses. *See*, §34-453(5)(a)

---

[3]   These vertical banners are to be displayed on "streetlight pole[s]... located on a principal or minor arterial roadway in the city". Presumably, the government owns both the streetlight pole and the right-of-way on which the pole is erected.

allowing an additional four foot square sign on a "gasoline service station pump island" and §34-453(6)(c) allowing canopy signs in lieu of wall-mounted signs.

Furthermore, the pump island signage can be installed without first applying for a permit as would be required for any other commercial venture. *See*, §34-453(5)(a)

B.      Restaurant are allowed a six square foot "menu display wall sign" and "umbrella signs" of three square feet each limited only by the number of outdoor tables allotted to the businesses. *See*, §34-453(5)(b) and (c). Those additional signs are not afforded to other kinds of businesses.

C.      Section 34-458(5) allows two "seasonal sales signs" for each frontage which are considered temporary signs or banners. Any businesses can display these seasonal signs for "a maximum of thirty-one (31) consecutive days" except for persons selling firewood of Christmas trees who are subject to disparate treatment:

(1)      Seasonal signs for Christmas tree salesmen are limited to the period of time "from the Saturday following Thanksgiving Day to midnight on December 24th of the same year". That time period is inexplicably less than the 31 days allowed for purveyors of pumpkins around Halloween, Menorah salesmen during Hanukah or Koran peddlers around Ramadan. Fur salesmen are allowed signs for a full 31 days; fir salesmen are not.

(2)      In contrast, salesmen of firewood are allowed to keep their seasonal signs in place "from the Saturday following Thanksgiving Day and ending March 1 of the following year" – a period far in excess of the 31 days allowed all other business except for the downtrodden merchants selling Christmas trees.

47.     The additional signage and exemptions granted to gas stations, valets, Christmas tree salesmen and vendors of firewood are dependent upon the identity of the speaker and/or the message conveyed by the speaker. In order to determine whether the additional signage is allowed or whether a permit must be obtained, the codes official must determine who is doing the advertising and what is said. For instance, a Christmas tree salesman would presumably not be granted the additional concessions if his banners advertised his on-premises barbeque joint.

48.     Under the controlling precedent of <u>Sorrell v. IMS Health Inc.</u>, ___ U.S. ___, 131 S. Ct. 2653 (2011), government may not discriminate among commercial messages or commercial speakers without a justification sufficient to meet "heightened scrutiny".

49.     The City of Jacksonville Beach has no substantial government interest in allowing gas stations, valets, Christmas tree salesmen and vendors of firewood to enjoy more and larger signage than that afforded to any other commercial enterprise. All of those governmental interests that support the Jacksonville Beach Sign Ordinance (aesthetics, traffic safety, etc.) are implicated by gas station signs and signage of the other favored businesses to the same extent as they are for other commercial endeavors.

### Content Based Prohibitions

50.     The Jacksonville Beach Sign Code also prohibits certain signs in all circumstances. In general, the prohibitions deal with physical characteristics which might bear on public safety. However, at least two of the prohibitions are content-based and require an examination of the contents of the sign before the official can determine whether it is permitted or prohibited. Plaintiff alleges the following particulars.

51.     Section 34-452(5) of the Sign Code prohibits effectively all off-premises signs.[4] That section defines "billboards" – a terms so broadly defined as to encompass almost any sign which is erected away from the property of the actual speaker:

> Billboard means a sign structure, including building and/or sign utilized for advertising an establishment, an activity, a product, service or entertainment, which is sold, produced, manufactured or furnished at a place other than on the property on which such structure and/or sign is located.

*See*, §34-41. That definition clearly requires a permitting official to inquire as to both the message on the sign and the identity of the property owner to determine whether the sign is a potentially lawful on-premises sign or a billboard which is prohibited in every circumstance.

52.     Section 34-452(15) of the Sign Code lists "Mobile billboard advertising" as among the signs which are prohibited at all times. However, there is a carve-out provision for three classes of speakers: buses [§34-452(15)(b)]; taxicabs [§34-452(15)(c)]; and speakers who do not reside within the City [§34-452(15)(d)]. Those preferred speakers may exhibit mobile billboard advertising while all other speakers are prohibited from displaying the same message under all circumstances.

53.     Section 34-452(34) of the Sign Code lists "Snipe signs" as among the signs which are prohibited at all times. Section 34-41 defines a snipe sign as follows:

> Snipe sign means a sign made of any material when such sign is tacked, nailed, posted, pasted, glued or otherwise attached to trees, poles, fences or other objects, and the advertising matter appearing thereon is not

---

[4] The only apparent exception may be "vertical banner signs" which suffer from their own constitutional infirmities as are addressed elsewhere in this Complaint

applicable to the present use of the premises upon which such sign is located.

The Ordinance does not prohibit all signs that are "tacked, nailed, posted, pasted, glued or otherwise attached to trees, poles, fences or other objects". Rather, only those signs which display a message which is "not applicable to the present use of the premises" are prohibited. A codes official must necessary examine the content of a sign to determine whether the message is "applicable to the present use of the premises". That determination is not equivalent to an on-premises / off-premises distinction, but requires an evaluation of the particular use and a consideration of whether the sign is "applicable" to that use.

54.     Certain of the distinctions between commercial signs and non-commercial signs are irrational, do not serve to advance any significant government interest, and are not narrowly tailored. Plaintiffs allege the following particulars:

A.      Section 34-452(8) prohibits *commercial* "sign spinners" but does not prohibit exactly the same individuals from using exactly the same tactics to convey a non-commercial message:

Sec. 34-452. - Prohibited signs.

The signs and sign types listed below are prohibited within the city limits and shall not be erected….

(8)     Commercial signs that are carried, waved, or otherwise displayed by persons ("signwalkers", "sign spinners", or "commercial mascots") either on public rights-of-way or in a manner visible from public rights-of-way. This provision is directed toward such displays intended to draw attention for a commercial purpose, and is not intended to limit the display of placards, banners, flags or other signage by persons participating in demonstrations, political rallies, or otherwise exercising their valid First Amendment rights.

55.     The content-based discrimination and opportunities for subjective enforcement based on the particular speaker or particular message permeate the entire Sign Code and comprises nearly all of the key definitional components of the Code. The unconstitutional portions of the Sign Code cannot be severed from the few portions of the Code that do not rely on content.

## THE ORDINANCE IMPOSES AN UNCONSTITUTIONAL PRIOR RESTRAINT

56.     The Jacksonville Beach Sign Code imposes an unconstitutional prior restraint because a speaker cannot display a sign without first obtaining permission from the government, and that permission is subject to discretionary determinations, indefinite times for decision-making and barriers to judicial review. *See*, FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 110 S. Ct. 596 (1990).

57.     The general permitting requirement for signs is found in §34-450 of the Sign Code:

Sec. 34-450. - Sign permits.

Unless exempt from permitting, no permanent sign shall be erected, altered, relocated, maintained or displayed until a sign permit is obtained from and the appropriate fee paid to the city. The sign permit is in addition to any building permit required to be obtained pursuant to the provisions of the Florida Building Code.

58.     All of Plaintiffs' commercial signage, including the signs posted by its tenants, are considered commercial messages under the sign Code and all require a permit pursuant to §34-450.

59.     In addition, Plaintiffs believe that many of their campaign and election speech and other non-commercial speech would be subject to the permitting requirement as some of that non-commercial speech is not clearly exempted from the permitting requirement.

60.     The Jacksonville Beach Sign Code affords the permitting official unbridled discretion in determining whether a particular sign requires a sign permit. Plaintiffs have identified a number of those specific circumstances and specific grants of discretion in paragraphs 33 through 40 above (Content-based exclusions and content-based exemptions).

61.     Section 34-450(8)(a)2. of the Jacksonville Beach Sign Code affords the permitting official unbridled discretion by authorizing that official to attached unspecified "conditions" to the permit before a sign can be displayed:

> (8) Sign permit application review.
>
> …
>
> 2.     A sign permit shall either be approved, *approved with conditions (meaning legal conditions existing in the Code such as dimensional requirements)*, or disapproved, and the decision shall be reduced to writing. A disapproval shall include or be accompanied by a statement of the reason(s) for the disapproval. (emphasis added).

The general statement that such conditions are confined to "legal conditions in the Code" is neither specific nor precise and does not adequately constrain the discretion of the permitting official. *See*, Lady J. Lingerie, Inc. v. City of Jacksonville, 176 F.3d 1358, 1362 (11th Cir. 1999).

62.     Section 34-450(8(a) allows the permitting official to deny a sign permit based on "any applicable zoning law". That provision allows the official to pick and

choose from unspecified standards and is not even limited to the zoning laws enacted by the City. *Compare*, Fly Fish v. City of Cocoa Beach, 337 F.3d 1301 (11th Cir. 2003).

63.     Section 34-450(8)(e)2. and (e)3. of the Jacksonville Beach Sign Code affords the permitting official unbridled discretion by authorizing that official to suspend review of an application indefinitely based on undefined criteria including anything that would require "any change to the application in order to obtain an unconditional approval" and any instance where "an applicant is required to obtain an approval of the sign from any other governmental agency". The permitting authority has unbridled discretion to determine which government approvals are material and also links approval to conditions which are neither specified not limited by the Code.

64.     The time period for granting or denying a sign permit is nominally set at thirty (30) days, but that period is illusory for several reasons:

A.     Section 34-450(8)(e) allows for the indefinite suspension of the permitting period beyond thirty (30) days under the following circumstances:

2.     If the applicant is required to make any change to the application in order to obtain an unconditional approval, the time shall be suspended while the applicant makes such change.

3.     If an applicant is required to obtain an approval of the sign from any other governmental agency, the time shall be suspended until such approval is obtained.

That provision does not require the permitting official to notify an applicant that its permit review is suspended nor does the official have to identify the basis for the suspension. An applicant might never know that the permitting officials have taken no action on its application under the 30 day period has run without a decision. Even then,

the applicant will not know the basis for the suspension without a separate application to the City. *See*, §34-450(8)(g).

      B.     If the time period provided for discretionary review of a sign permit expires without a decision, the applicant must be allowed to speak (in this case, display its sign) without a permit. However, §34-450(8)(a)3 does not allow the speech to go forward following the expiration of the nominal thirty day time period. Instead, the permit is "deemed denied" and the speech cannot occur even if the application is legally sufficient and the delay was the result of malice or bureaucratic ineptitude:

> 3.     In the event that no decision is rendered within thirty (30) calendar days following submission, the application shall be deemed denied.

      C.     The procedures for administrative review are inadequate because they do not guarantee a decision within a specified brief period of time. In the event that an applicant wishes to challenge the denial of a permit (either through an intentional denial or a denial based on the passage of time) or should an applicant wish to challenge the indefinite suspension of review under §34-450(8)(e), the Ordinance provides that the applicant can obtain review of the decision within 14 days for denials (§34-450(8)(c)) or 20 days for suspensions (§34-450(8)(g)). However, the Ordinance does not specify what happens if the planning director refuses or neglects to make a decision with the review period. The provisions for review simply provides a time period without specifying any consequences for failure to comply:

> 2.     Upon the timely filing of a request for reconsideration, the decision of the director of planning and development or designee shall be deemed stayed and not a final decision, until the request for reconsideration is decided. The request for reconsideration shall be decided within fourteen (14) days of receipt by the city, not counting any intervening Saturday,

> Sunday, or legal city holiday. Such decision shall be in writing and shall
> include a statement of the reason(s) for the decision.

There is no way to force an administrative decision if the reviewing official fails to make

a decision within the nominal times established by the Ordinance. Instead, the official can

effectively sit on a permitting decision forever, thereby denying speech indefinitely.

65.     The Ordinance imposes insurmountable obstacles to prompt judicial

disposition. *See*, City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C., 541 U.S. 774, 124 S.

Ct. 2219 (2004). Plaintiffs allege the following particulars:

A.      "Deemed denials" under §34-450(8)(a)3 make prompt judicial review

impossible in two common circumstances:

(1)     Judicial review is either unavailable or is indefinitely delayed

where there is no administrative decision. The Ordinance specifies that "[a]n approval, an

approval with conditions, or disapproval by the director of planning and development

shall be deemed the final decision of the city upon the application." *See*, §34-450(8)(b).

However the Ordinance does not state that a deemed denial through inaction and the

expiration of the 30 day review period under §34-450(8)(a)3 is a final decision of the

City. Instead, the deemed denial appears to be unreviewable unless and until the applicant

takes the additional step of applying for reconsideration of that decision. *See*, §34-

450(8)(b). A request for reconsideration is nominally considered within 14 days, but the

Code does not specify what happens if the planning director does not comply with the

Code and simply makes no decision within the specified time. The consequences appear

to be two-fold:

(a)     There is no final administrative action so the action is not ripe and cannot be appealed. *See*, §34-450(8)(c)2 ("the decision of the director of planning and development or designee shall be deemed stayed *and not a final decision*") (emphasis added).

(b)     Speech cannot go forward because the Code specifically states that the permitting decision is stayed pending the indefinite administrative review. *See*, §34-450(8)(c)2 ("the decision of the director of planning and development or designee *shall be deemed stayed* and not a final decision") (emphasis added).

(2)     In the event of an actual denial of the application, the decision is final, but reconsideration is still governed by §34-450(8)(c), which provides a 14 day period for review. However, as seen above, there are no consequences specified if the planning director fails to make a decision within the specified period of time. Under such circumstances, the planning director can thwart judicial review indefinitely simply by failing or refusing to make a decision.

## THE SIGN ORDINANCE IS UNCONSTITUTIONALLY OVERBROAD

66.     The treatment of "commercial messages" in the Jacksonville Beach Sign Code is substantially overbroad and is not subject to a narrowing construction.

67.     The Jacksonville Beach Sign Code discriminates against commercial signage in terms of the location of commercial signs, their size, their duration, and whether they require permits.

68.     The definition of "commercial message" is unconstitutionally overbroad because it includes within its scope a great deal of speech which is not properly

categorized as "commercial" and which cannot be subject to the content-based review sometimes tolerated for commercial speech. Section 34-41 defines "commercial message" as follows:

> Commercial message means any sign wording, copy, logo, or other representation or image that directly or indirectly names, advertises, or calls attention to a product, service, sale or sales event or other commercial activity.

69.     That provision is overbroad because it is not limited simply to messages which merely propose a commercial transaction. Rather, the Ordinance, as drafted, sweeps within its scope any sign which so much as "names" a business or "calls attention to" a product or service regardless of whether the message is displayed for commercial purposes. A District Judge in Florida recently listed the following types of messages which would usually be considered non-commercial in nature, but which would fall within the scope of a very similar definition of "commercial message":

> • An animal-rights activist stands near McDonalds on Washington Avenue, handing out flyers that read, "Shame on McDonalds! They Don't Use Cage-Free Eggs!"

> • Her friend walks around Lummus Park, distributing bumper stickers that read, "Free Lolita! The Seaquarium keeps her in a small tank!"

> • A rabbi stands on Ocean Drive, and distributes pamphlets to visiting yeshiva students that inform them which restaurants in the area serve kosher food.

> • A food critic, who wants more people to visit her website and to read her blog, distributes laminated placards that list the names, locations, and her review of "Foodie Freddi's Four Favorite Pizza Shops on Lincoln Road."

> • Someone stations herself near a cigar store on Española Way, handing out stickers that read, "Smoking tobacco is bad for your health."

FF Cosmetics FL Inc. v. City of Miami Beach, Florida, __ F.Supp. 3d __, 2015 WL 5145548, at *13 (S.D. Fla. Aug. 31, 2015).

An example specific to the quirky Jacksonville Beach Code would include a billboard protesting against Apple's use of Chinese labor that displays the well-known logo with an equally understandable slash across the logo.

70.     The overbreadth of the definition of "commercial message" is substantial. Furthermore, the reach of that term is not narrowed by the definition of "non-commercial message" that merely employs the negative: "Non-commercial message means any message which is not a commercial message."

## PORTIONS OF THE SIGN CODE ARE UNCONSTITUTIONALLY VAGUE

71.     A number of definitions and regulatory provisions of the Jacksonville Beach Sign Code are unconstitutionally vague in that a person of reasonable intelligence could not readily ascertain its meaning or the meaning is such that it would invite and encourage arbitrary enforcement actions. Those vague provisions include the following:

A.     The definitions of "sign" excludes a large number of sub-parts which are also defined in §34-41 of the Code:

(1)     The definition of the term "artwork":

Artwork means a two- or three-dimensional representation of a creative idea that is expressed in a form and manner as to provide aesthetic enjoyment for the viewer rather than to specifically convey the name of the business or a commercial message about the products or services offered on the property upon which the artwork is displayed. All outdoor artwork shall conform to the maximum height restrictions in any particular zone in which it is located. All outdoor artwork shall also conform to any applicable building and safety standards.

The determination of whether something constitutes artwork is completely subjective because it turns on three completely unquantified and unquantifiable concepts:

      (a)    The term is apparently limited only to a representation of "a creative idea";

      (b)    The term includes only those representations which "provide aesthetic enjoyment for the viewer"; and

      (c)    The aesthetic values must outweigh whatever portion of the sign is devoted to the "name of the business" or any "commercial message".

      (2)    The Ordinance excludes "(8) [n]ewsracks and newsstands" from regulation as signage but does not define either of those terms. One cannot tell from this Ordinance whether only vendors such as the New York Times are exempt from the sign code; whether the exemption extends to any business selling books, magazines or paper goods; and whether there are any restrictions on how large a message on a newsstand can be before it falls within the sign regulations (if it ever does).

      (3)    The Ordinance excludes "(4) [m]anufacturers' marks" as long as the mark is attached to a product after sale. One cannot tell from that undefined term whether it is intended to apply only to registered trademarks or whether the exemption extends to any logo or identifying mark as long as it is attached to a product. One also cannot tell whether there are any size restriction on the mark: can a vendor display 10 foot banners in front of his store as long as they are attached to a teddy bear?

      (4)    The Ordinance excludes "(6) [c[ertain insignia on vehicles and vessels: On-street legal vehicles and properly licensed watercraft: license plates, license plate

frames, registration insignia, noncommercial messages". The ambiguity here is whether noncommercial messages can be freely displayed, without limitation on vehicles and vessels (in terms of wrap-around messages, magnetic banners and similar devices) or whether the non-commercial messages can be displayed only on a license plate or license plate frame.

B.      Section 34-446 of the Sign Code excludes "Temporary holiday and seasonal decorations" from regulation under the Code. That terms is defined in §34-41 of the Code as follows:

> Holiday and seasonal decorations means decorations that pertain to legal or other recognized holidays or to a season of the year.

That definition is unconstitutionally vague because it does not include a list of "recognized holidays" or specify how a code official is supposed to determine whether a holiday is "recognized" or not. This terms runs the risk of discriminating against minority religions whose holidays may not be known (and therefore "recognized") by a code official. Furthermore, the Code is vague as to whether decorations may be displayed for the entire year, or are limited to some arbitrary time period around whatever the particular holiday may be. The term "holiday" is undefined by the Code.

C.      Political campaign and election signs share a common definition under §34-41. However, it appears that "political campaign signs" are treated differently from "election signs" under standards which cannot be readily understood and are subject to arbitrary enforcement. Plaintiff alleges the following particulars:

(1)     There is no separate definition for "election signs".

(2)     Section 34-453(2)(i)4 requires that "[a]n *election sign* shall be removed within seven (7) calendar days following the election to which it pertains." (emphasis added). It is not clear whether that section is intended to include "political campaign signs".

(3)     The definition for "Political campaign and election signs" encompasses signs "pertaining to the advocating by persons, groups or parties of political views or policies."

(4)     The political issues which would seem to fall within that definition are not necessarily tied to any particular election and it makes no sense to require the removal of such signs after an election.

(5)     Officials tasked with enforcing the Code must determine whether an "election sign" is different from a "political campaign sign" and whether a "political campaign sign" must be removed at some time after a particular election. Those distinctions are content-based and there are no guidelines in the Ordinance to govern such determinations. By way of example, one cannot tell whether a sign that says "Support Democrats who are for Free Choice" is an "election sign" which must be removed or a "political campaign sign" that is not tied to any particular election. Alternatively, one cannot determine whether that message is a "political campaign sign" or a "free expression sign" addressed below.

D.     There is an irreconcilable conflict in the definitions of "Political campaign and election signs" and "free expression signs" which leaves the ultimate application of

the Ordinance to the discretion of individual codes officers. Plaintiffs allege the following particulars:

(1)      "Political campaign sign or election sign means any sign indicating the name and/or picture of an individual seeking election to a public office, or relating to a forthcoming public election or referendum, or pertaining to the advocating by persons, groups or parties of political views or policies." *See*, §34-41.

(2)      "Free expression sign means a sign communicating information or views of concern to the owner of the sign, or containing any other non-commercial message, that is otherwise lawful." *See*, §34-41.

(3)      Political campaign and election signs" are regulated more strictly than "free expression signs" under the Jacksonville Sign Code. *Compare*, §34-453(2)(d) with §34-453(2)(i). Political signs must be smaller and must be removed shortly after an election; in contrast to free expression signs can be larger and face no temporal limitations. Id.

(4)      The definition of "political campaign or election signs" does not appear to be limited only to matters pertaining to a single election or a single candidate. While those issues form a part of the definition, "political campaign or election signs" is written in the conjunctive and also includes messages "pertaining to the advocating by persons, groups or parties of political views or policies."

(5)      The latter portion of the definition of "political campaign or election signs" appears to overlap completely with the definition of a free expression sign as "a sign communicating information or views of concern to the owner of the sign". Both

allow the speaker to address matters of concern to him or her, with "political campaign signs" apparently being a subset of "free expression signs". In particular, "political campaign signs" appear to be "free expression signs" which address "political views or policies".

(6)    There is nothing to guide the decisionmaker called upon to determine whether a particular sign is to be governed under the restrictions applicable to "political campaign or election signs" or those applicable to "free expression signs".

(7)    There is nothing to guide the decisionmaker who is called upon to determine whether a particular sign is addressing "political views or policies" or a more general sign "communicating information or views of concern to the owner of the sign".

72.    The provisions regarding vertical streetlight banners found in §34-458(3) are vague in two respects:

A.    Section 34-458(3)a. allows vertical banners to be erected for the promotion of "civic" events without defining that word. A reasonable person cannot determine whether the right to display such banners is limited only to government-approved events or also includes private citizens engaged in some undefined public good.

B.    Section 34-458(3)e. allows vertical banners to include the name and logo of a commercial sponsor so long as that display is "not for advertising purposes". No standards are given as to when an inherently commercial logo (*e.g.* the Nike "swoosh" or the Apple "apple") is or is not used for advertising purposes.

## ORDINANCE UNCONSTITUTIONAL AS APPLIED

73.    The provisions regarding "political campaign or election signs" is

unconstitutional as applied to the Plaintiffs because they favor owners of small parcels at the expense of owner of large parcels, such as the Plaintiffs.

74.     Section 34-453(2)(i) allows only a certain number of "political campaign or election signs" per parcel:

> i.     Political campaign or election signs. For each parcel within the city, one (1) election sign for each candidate and each issue may be displayed on each frontage per parcel of land.

75.     Under 34-453(2)(i), large parcels are allowed the same number of signs as small parcels, with each parcel being allowed only per frontage [presumably up to a maximum of four for a parcel bounded on all sides by roads. See, 34-41 "Frontage, lot means the horizontal distance between the side lot lines measured at the point where the side lot lines intersect the street right-of-way. All sides of a lot that abut a street shall be considered lot frontage."].

76.     Plaintiffs' commercial strip properties are measured in the terms of multiple acres. Yet, Plaintiffs are limited to the same number of political signs as fractional lots measured in terms of mere square feet.

77.     The restrictions on political signage dilute Plaintiffs' political and speech rights as compared to small lot owners.

## THE ORDINANCE IS CONSTITUTIONALLY UNDERINCLUSIVE

78.     As shown above, the Jacksonville Beach Sign Ordinance includes numerous exclusions, exceptions, prohibitions and discriminatory applications that all turn on the particular content of the message rather than the size, location, duration or other physical attributes of the actual sign.

79.     The content-based nature of the Sign Code is apparent on its face: almost every regulation in the Ordinance requires the permitting or enforcement official to read the sign before he can determine whether the sign is lawful and should be permitted. *See, generally*, Reed v. Town of Gilbert, Ariz., __ U.S. __, 135 S. Ct. 2218 (2015).

80.     The City's asserted interests in such matters as traffic flow, public safety and aesthetics are not advanced by these content-based determinations. An unsafe or unsightly sign violates public policy whether it includes an advertisement for toothpaste or a message saying that racism is evil.

81.     The content-based determinations complained of do not revolve around the arguably permissible distinction between commercial and non-commercial speech. Rather, the content-based nature of the Ordinance is manifested through the multiple categories, exclusions and exemptions which permeate the Code, many of which deal with non-commercial and core political speech. Without limiting the many such distinctions identified in this Complaint, Plaintiffs lists the following general content-based distinctions apparent on the face of the Sign Code:

A.     The Code distinguishes between different kinds of political speech. Some speech is described as election-oriented and some is regulated as issues-oriented speech with different rules applicable depending upon which category the speech falls within.

B.     The Code makes multiple distinctions between different kinds of non-commercial speech such as messages pertaining to "civic" events, holidays, religious organizations or messages appearing on flags or incorporated into a piece of acceptable "artwork".

C.     The Code distinguishes between different commercial speakers, favoring some while outlawing others. Favored speakers include buses, gas stations, firewood salesmen, especially-talented artists and valet services. Disfavored speakers include Christmas tree salesmen, professional mascots, owners of benches, and artists whose work is deemed unaesthetic or overly commercial.

D.     The Ordinance distinguishes between on-premises signs and off-premises signs (such as billboards).

82.     The Sign Code overtly favors certain messages and speakers over others.

83.     The Sign Code also allows permitting and enforcement officials to make covert decisions which favor or disfavor certain messages or speakers through the enormous discretion and vague criteria which is found throughout the Ordinance.

84.     The Jacksonville Beach Sign Code is unconstitutionally underinclusive because it closely regulates or completely prohibits some signs based on the message or the speaker while allowing physically identical signs erected by favored speakers or displaying preferred content.

<u>**OTHER FIRST AMENDMENT VIOLATIONS**</u>

85.     Sections 34-450(5)(a) and §34-451(1) impose an unconstitutional "heckler's veto" by allowing a third party to have control over the sign permitting decision. A tenant in lawful possession of real property is required to obtain the consent of the property owner before erecting any sign – even a temporary sign:

> 34-450
> …
> (5)     Sign permit applications. A sign permit application for permanent and certain temporary signs, as may be required by this division, shall be

prepared and submitted on forms available at the department of planning and development.... The applicant shall furnish the following information on or with the sign permit application form:

      a.    .... If the applicant is anyone other than the property owner, the applicant shall provide written authorization from the property owner permitting the installation of the sign.

34-451

...

(1)    Land owners' consent. No sign may be displayed without the consent of the legal owner of the property on which the sign is mounted or displayed. For purposes of this policy, "owner" means the holder of the legal title to the property and any party and person holding a present right to possession, control, or use of the property.

Government may not condition the right to speak on permission granted by a third party and may not deny the right to speak based on the objections of a third party.

## DAMAGES AND ATTORNEY'S FEES

86.    Violation of the Jacksonville Beach Sign Code exposes the alleged violator to civil fines of as much as $500.00 per day of violation and incarceration for up to 90 days:

Whenever in this Code or in any ordinance of the city any act is prohibited or is made or declared to be unlawful or an offense, or whenever in such Code or ordinance the doing of any act is required or the failure to do any act is declared to be unlawful, where no specific penalty is provided therefor, the violation of any such provision of this Code or any ordinance shall be punished by a fine not exceeding five hundred dollars ($500.00) or imprisonment for a term not exceeding ninety (90) days, or by both such fine and imprisonment in the discretion of the judge. Each day any violation of any provision of this Code or of any ordinance shall continue shall constitute a separate offense.

*See*, §1-11(a), Jacksonville Beach Code of Ordinances.

87.    Plaintiffs' activities are protected by the First Amendment. Plaintiffs have a clear legal right to engage in political and commercial speech, including advertising.

88.     Plaintiffs asserts that their position, set forth in this Complaint, is legally sound and supported by fact and law. The Defendant's ordinances and policies, however, have created a *bona fide* controversy between the parties, and Plaintiffs are in doubt as to their rights, privileges and immunities with respect to the enforcement of the legislation at issue herein. Plaintiffs require, therefore, a declaratory judgment declaring their rights, privileges and immunities. There is a clear, present, actual, substantial and *bona fide* justiciable controversy between the parties.

89.     Plaintiffs have retained BENJAMIN, AARONSON, EDINGER & PATANZO, P.A. and UPCHURCH BAILEY AND UPCHURCH, P.A. and as their attorneyS to represent them in this action and have agreed to pay their attorneys a reasonable fee, which fee Defendant must pay pursuant to 42 U.S.C. §1988.

## COUNT I

### (First Amendment Claims)

90.     Plaintiffs reallege each and every allegation set forth in paragraphs 1 through 89 of this Complaint and incorporate them herein by reference.

91.     This is an action for declaratory relief pursuant to Title 28, U.S.C., §2201.

92.     Plaintiffs are uncertain as to their rights and remedies under the Jacksonville Beach Sign Ordinance [Chapter 34 (Land Development Code), Article VIII, Division IV, §§34-441 through 34-457, et, seq. together with the definitions Chapter 34, Article IV, §34-41 of the Jacksonville Beach Code of Ordinances] with respect to the Constitution of the United States.

93.     Plaintiffs believe and herein allege that the Sign Ordinance is unconstitutional on its face and as applied against Plaintiffs.

94.     Plaintiffs and their tenants have been forced to obtain permits for signs under an unconstitutional permitting system and those citizens have refrained from displaying signs of their choosing out of fear that they will be prosecuted under this content-based and discriminatory Ordinance.

95.     As a direct and proximate result of Defendant's actions, Plaintiffs have suffered and will continue to suffer damages in that their civil rights have been violated.

96.     The Ordinances, policies and actions of Defendant, acting under color of state law, violated Plaintiffs' constitutional rights to engage in free speech.

97.     Plaintiffs are suffering irreparable injury and are threatened with irreparable injury in the future by reason of the Defendant's Ordinances, policies and actions. Plaintiffs have no plain, adequate, nor complete remedy to protecttheir constitutional rights and to redress the wrongs and illegal acts complained of, other than immediate and continuing injunctive relief.

98.     Plaintiffs will suffer a continuing violation of their civil rights and liberties as a result of the Defendant's Ordinances, policies and actions should an injunction not issue.

99.     A permanent injunction will preserve Plaintiffs' civil rights and reduce the need to compensate Plaintiffs with money damages for further violations of their rights.

100.    The harm which would be suffered by the Plaintiffs without an injunction — the loss of their constitutional rights — exceeds any conceivable harm the Defendant

would suffer if it is prohibited from enforcing its Sign Ordinance which clearly violates the most cherished principles of the First Amendment.

101.    A permanent injunction prohibiting Defendant from engaging in such unconstitutional actions in the future would not be contrary to the public interest.

WHEREFORE, Plaintiffs prays for the following relief:

A.    That this Court take jurisdiction over the parties and this cause.

B.    That this Court enter a judgment declaring that t the Jacksonville Beach Sign Ordinance [Chapter 34 (Land Development Code), Article VIII, Division IV, §§34-441 through 34-457, *et. seq.* together with the definitions Chapter 34, Article IV, §34-41 of the Jacksonville Beach Code of Ordinances]  was and is unconstitutional on its face, and as applied to Plaintiffs.

C.    That this Court enter a judgment for damages sufficient to compensate the Plaintiffs for violation of Plaintiffs' right to freedom of expression.

D.    That this court award Plaintiffs their recoverable costs, including reasonable attorney's fees pursuant to 42 U.S.C. §1988.

E.    That this Court award Plaintiffs all other relief in law and in equity to which they may be entitled.

## COUNT II

### (Declaratory Judgment – State Law Claim – Non-Conforming Signs)

102.    Plaintiffs reallege each and every allegation set forth in paragraphs 2, 4 and 6, 9 through 11 and 23 of this Complaint and incorporate them herein by reference.

103.    This Court has jurisdiction over this state law cause of action because Plaintiffs' other claims involve Federal Questions and this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

104.    This is an action under Florida law for declaratory and supplemental relief pursuant to Chapter 86 of the Florida Statutes.

105.    Plaintiff BROTHERS FIVE OF JACKSONVILLE maintains a sign at its commercial property located 1227 South Third Street, Jacksonville Beach, Florida. A picture of the subject sign appears in Exhibit "B" to this Complaint (part of the sign application addressed below).

106.    The subject sign is a lawful non-conforming use under the Jacksonville Beach Sign Code because it was erected prior to the effective date of the Code. *See*, § 34-456(1)(a) ("A legal nonconforming sign is a sign that lawfully existed at the time of the enactment of this division that does not conform to the regulations as specified in this division.").

107.    The subject sign includes advertising for Plaintiff's tenants at that location.

108.    The tenant advertising is crucial for both their commercial survival and for Plaintiff's income as property owner.

109.    Plaintiff has a strong interest in maintaining the subject sign for purposes of both public safety and aesthetic value since effective tenant advertising depends upon attractive advertising.

110.    The Jacksonville Beach Sign Code theoretically allows Plaintiff to repair and maintain its non-conforming sign indefinitely so long as those repairs do not expand

the non-conformity. Several provisions grant citizens the right to repair and maintain their non-conforming signs;[5]

> Sec. 34-456. - Nonconforming signs.
>
> …
>
> (1)     Legal nonconforming signs:
>
> …
>
> c.     A legal nonconforming sign may not be altered in any manner not in conformance with this division. This does not apply to reasonable repair and maintenance of the sign or to a change of copy provided that by changing the copy structural alterations are not required.
>
> …
>
> (2)     Signs rendered nonconforming:
>
> a.     Except as provided in this section, a nonconforming sign may continue in the manner and to the extent that it existed at the time of the adoption, amendment or annexation of the division which rendered the sign nonconforming. This section shall not prohibit reasonable repairs and alterations to nonconforming signs.
>
> Sec. 34-450. - Sign permits.
>
> …

---

[5] The City's Code provides generally that non-conforming structures of all kinds can be repaired up to a certain point without losing their non-conforming status:

> Sec. 34-622. - Nonconforming uses.
>
> Nonconforming uses of land are declared generally incompatible with the LDC. Nonconforming uses of land may continue in accordance with the provisions of this section.
>
> (1)     *Normal maintenance or repair.* Normal maintenance or repair of structures where nonconforming uses are located may be performed in any period of twelve (12) consecutive months, to an extent not exceeding fifteen (15) percent of the current assessed value of the structure, provided that the cubic content of the structure existing after the date it became nonconforming shall not be increased, except pursuant to the standards of this section.

Chap. 34, Art. XII, §34-622.

(2)     A sign lawfully erected may be repainted or have ordinary and customary repairs performed, including replacement of plastic or glass panels, without a sign permit; however, if such sign is to be structurally altered in any manner, a new sign permit shall be required and the altered sign must meet all requirements of this division and this Code.

111.    Historically, the City's permitting authorities have applied §34-456 in a highly variable and arbitrary manner. Certain citizens have been allowed to fully renovate their non-conforming signs while others, including Plaintiff, have been denied the right to perform any repairs to its non-conforming signs at all.

112.    Plaintiff has been repeatedly told that it would not be able to perform any maintenance on the subject sign other than replacing the copy on the sign.

113.    On or about September 9, 2015, Plaintiff BROTHERS FIVE OF JACKSONVILLE applied for a sign permit to allow Plaintiff to perform critical maintenance and repair of the subject sign. Those repairs were strictly within the limitations imposed by §34-456 and were necessary to maintain the sign in safe condition. The repairs did not seek to expand the size of height of the existing sign. A copy of Plaintiff's sign application is attached as Exhibit "B" to this Complaint.

114.    True to its representations, the City denied the permit application and would allow no work to be done on the subject sign whatsoever. A copy of the City's denial of the sign application is attached as Exhibit "C" to this Complaint.

115.    BROTHERS FIVE OF JACKSONVILLE maintains that it has a right to repair and maintain as specified in the text of the Jacksonville Beach Sign Code.

116.    However, a dispute has arisen between the parties because the permitting officials interpret the City's Sign Code in a manner which disallows all repairs to non-

conforming signs or permits them on an ad hoc basis subject to the discretion of individual permitting officials.

117.    Plaintiff seeks a declaratory judgment that the Jacksonville Beach Sign Code – specifically §34-450(2) and §34-456 – allow for the repair and maintenance of lawful non-conforming signs.

118.    Plaintiff seeks a declaratory judgment that it has the right to repair and maintain its non-conforming sign in accordance with the plain text of the Jacksonville Beach Sign Code – specifically §34-450(2) and §34-456.

119.    Plaintiff further seeks a declaration that City permitting officials have no right to deny a permit to repair or maintain a lawful non-conforming sign so long as such repairs and maintenance conform to the plaint test of the Code.

**WHEREFORE**, Plaintiff prays for the following relief:

A.      That this Court take jurisdiction over the parties and this cause;

B.      That this Court enter a judgment declaring that:

(1)     The Jacksonville Beach Sign Code – specifically §34-450(2) and §34-456 – allow for the repair and maintenance of lawful non-conforming signs.

(2)     Plaintiff has the right to repair and maintain its non-conforming sign in accordance with the plain text of the Jacksonville Beach Sign Code – specifically §34-450(2) and §34-456.

(c)     City permitting officials have no right to deny a permit to repair or maintain a lawful non-conforming sign so long as such repairs and maintenance conform to the plaint test of the Code.

C.      That this Court award Plaintiff all other supplemental relief in law and in equity to which it may be entitled, including an award of his costs.

## COUNT III

### (Declaratory Judgment – State Law Claim – Conflict with §166.033, Fla.Stat.)

120.    Plaintiffs reallege each and every allegation set forth in paragraphs 2, 4 and 6, 9 through 11 and 23 of this Complaint and incorporate them herein by reference.

121.    This Court has jurisdiction over this state law cause of action because Plaintiffs' other claims involve Federal Questions and this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

122.    This is an action under Florida law for declaratory and supplemental relief pursuant to Chapter 86 of the Florida Statutes.

123.    Jacksonville Beach has implemented a process for permitting signs which amounts to an application for a "development order" under §166.033, Fla.Stat.

124.    The permitting provisions of the Jacksonville Beach Sign Code is in conflict with §166.033, Fla.Stat. in two respects:

A.      The Jacksonville Beach Sign Code only requires that the permitting official provide the reasons why a sign application has been denied (and in the case of a "deemed denial" after 30 days, no reason is given at all). In contrast, §166.033(2), Fla.Stat. states that the explanation given to the applicant "must include a citation to the applicable portions of an ordinance, rule, statute, or other legal authority for the denial of the permit." The Sign Code does not comply with the more rigorous and specific requirements of the statute.

B.      Section 34-450)8)(e)3 of the Jacksonville Beach Sign Code specifically authorizes the permitting official to consider regulations and requirements of other governmental agencies and to suspend the processing of a sign application until that third party approval is obtained:

> If an applicant is required to obtain an approval of the sign from any other governmental agency, the time shall be suspended until such approval is obtained.

In contrast, §166.033(4), Fla. Stat. prohibits conditioning of a permitting decision based on what other governments may require unless the third-party agency has actually denied a necessary permit:

> (4)      For any development permit application filed with the municipality after July 1, 2012, a municipality *may not require as a condition of processing or issuing a development permit that an applicant obtain a permit or approval from any state or federal agency* unless the agency has issued a final agency action that denies the federal or state permit before the municipal action on the local development permit. (emphasis added).

118.    Subsection 34-450(8)(e)4. contains an illusory exception if the "applicant may elect … to not obtain an approval that may be required by another governmental agency, and may instead demand a decision upon the sign permit as filed." That subsection allows for a pocket veto by "deem[ing] denied" such an application if not processed "within thirty (30) days after receiving such demand."

119.    Art. I, §9 of the Florida Constitution states that "[n]o person shall be deprived of life, liberty or property without due process of law …."

125.    The above- described conflict between the City's Sign Code and §166.033, Fla.Stat. violates the Plaintiffs' due process rights, as implemented in that statute, by failing to inform Plaintiffs of the ordinance basis for denial and by purportedly

authorizing the City to withhold the application - or even to deny the sign application - based on the authority of other agencies.

126.    A dispute has arisen between the parties because the Jacksonville Beach Sign Code requires Plaintiffs to submit applications for sign permits under a permitting scheme which does not comply with §166.033, Fla.Stat.

127.    Plaintiff seeks a declaratory judgment that the Jacksonville Beach Sign Code violates §166.033, Fla.Stat. as well as the due process clause of the Florida Constitution.

WHEREFORE, Plaintiff prays for the following relief:

A.    That this Court take jurisdiction over the parties and this cause;

B.    That this Court enter a judgment declaring that the Jacksonville Beach Sign Code violates §166.033, Fla.Stat. as well as the due process clause of the Florida Constitution and may not be enforced.

C.    That this Court award Plaintiff all other supplemental relief in law and in equity to which it may be entitled, including an award of his costs.

## JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable as a matter of right.

## DECLARATION

### (28 U.S.C. § 1746)

I, ELI SLEIMAN, JR., do declare as follows:

1.    I am ELI SLEIMAN, JR.

2.    I am the authorized representative of DUVAL ROYAL INVESTMENTS, INC. and BROTHERS FIVE OF JACKSONVILLE. I am authorized to execute this Declaration on behalf of both of the said Plaintiffs.

3.    I have read the foregoing Complaint, and all of the facts alleged in the Complaint are true and correct.

4.    I declare, under penalty of perjury, that the foregoing is true and correct.

Dated:  September 29, 2015

_____
ELI SLEIMAN, JR.


*Respectfully submitted,*

UPCHURCH, BAILEY AND
UPCHURCH, P.A.

BENJAMIN, AARONSON, EDINGER &
PATANZO, P.A.

__/s/ Sidney F. Ansbacher_____
SIDNEY F. ANSBACHER, Esquire
Florida Bar No.: 611300
780 N Ponce de Leon Blvd
St Augustine, FL 32084-3519
(904) 829-9066/ 825-4862 (Fax)
sfansbacher@ubulaw.com

___/s/  Gary S. Edinger_____
GARY S. EDINGER, Esquire
Florida Bar No.: 0606812
305 N.E. 1st Street
Gainesville, Florida 32601
(352) 338-4440/ 337-0696 (Fax)
GSEdinger@aol.com

*Attorneys for Plaintiff*